## Textile Biocides Inc. v. Avecia Inc.

*Roberto Rivera-Soto,* for plaintiffs.
*Howard D. Scher,* for defendant.

HERRON, *J.,* July 26, 2001—Plaintiffs Textile Bio-cides and Saniclean signed agreements to buy and sell the defendant Avecia's antimicrobial product Reputex.[1] The deal went poorly for both sides. The plaintiffs sued Avecia for fraud, breach of contract, tortious interference and negligent misrepresentation. Avecia filed coun-

---

1. The agreements were between the plaintiffs and Avecia's predecessor, Zeneca. Avecia succeeded to Zeneca's interests in those agreements in July 1999. Complaint ¶3 and answer ¶3. Though the plaintiffs alleged in the complaint that the succession provided the motive for Avecia's conduct, the plaintiffs did not pursue that theory in their motion papers. As the distinction between Zeneca and Avecia does not seem to be relevant to these motions, this opinion refers to Zeneca and Avecia as "Avecia."

terclaims for fraud and breach of contract. Each side moved for summary judgment on the other's claims. The court grants in part both sides' motions.

## FACTS

### I. *Avecia, Reputex and the EPA*

Avecia is the manufacturer of Polyhexamethylene Biguanide Hydrochloride solution (PHMB), an antimicrobial product that Avecia markets as, among other brand names, Vantocil IB and Reputex 20. The EPA classifies PHMB as a pesticide. The EPA requires the registration of a pesticide—including each brand name and each use—before it can be sold in the United States. 40 C.F.R. §§152.15, 152.113. The scope of the registered uses determines the breadth of the advertising and labeling claims that a seller of a pesticide may make. By April 1997, PHMB was registered with the EPA under the primary brand name Vantocil "as an agent to control the growth and action of microorganisms, and control generation of odors, on textiles such as cotton, cotton blends . . . and cellulosic material such as non-wovens, tissues, paper and pulps." Vantocil's EPA registration number is 10182-128. In September 1997, the EPA accepted Avecia's application to add the brand name Reputex to the PHMB registration.

The EPA calls the textiles and cellulosic materials to which a pesticide may be applied "treated articles." 40 C.F.R. §152.25. Under the "treated article exemption," an article treated with a registered pesticide need not be separately registered with the EPA as long as the pesticide is registered for use on that article and the manu-

facturer does not claim that the pesticide has an effect on anything other than the treated article itself. 40 C.F.R. §152.25(a); (exhibit DA-6, pesticide registration notice 2000-1, 3/6/00).[2] For example, Avecia may claim that Reputex controls microorganisms on a cloth treated with Reputex. Avecia may not claim that Reputex controls microorganisms on a kitchen counter wiped with the treated cloth.

The EPA has further limited the treated article exemption to prohibit making public health claims. A public health claim is a claim for the control of specific microorganisms. For example, Avecia may not claim that Reputex controls the growth of E. coli. To expand the Reputex registration to include such a public health claim, Avecia would have to submit data to the EPA showing that Reputex does indeed control the growth of E. coli. (Exhibit DA-6, pesticide registration notice 2000-1, 3/6/00; exhibit DA-14, Wright memo to Schapiro, 7/18/97.) Avecia admits that Reputex is not and never has been registered for public health claims.

EPA registration no. 10182-128 permits Avecia to sell Reputex in the United States. To sell Reputex in a foreign country, Avecia must fulfill any registration requirement of that country. Avecia admits that Reputex is not and never has been registered for sale or use in Mexico or Canada. (Exhibit P-8, Burt dep., 6/19/00, at 199-200.)

---

2. This opinion refers to the exhibits attached to Avecia's motion for summary judgment as "exhibit DA-1," "exhibit DA-2," etc.; the exhibits attached to Avecia's reply brief as "exhibit DB-1," "exhibit DB-2," etc.; and the exhibits attached to Avecia's response to plaintiffs' motion for summary judgment as "exhibit DC-1," "exhibit DC-2," etc.

## II. *According to the Plaintiffs, Avecia Misrepresented Facts About the Status of the Reputex Registration to Induce the Plaintiffs to Sign the Agreements*

In 1996, Saul Schapiro learned that Avecia sells PHMB. Schapiro began discussions with Avecia about using PHMB for the treatment of wipes and towels. Avecia informed Schapiro that PHMB was not yet registered with the EPA. (Exhibit P-1, complaint, ex. 1, Lee letter to Schapiro, 7/30/96.)

Schapiro contemplated a deal between Avecia and his companies Global Nonwoven Technologies and Daniel Schapiro & Co. In correspondence with Avecia he estimated that he could sell wipes and towels containing 39,000 pounds of Reputex in one year. He later raised that estimate to 118,000 pounds per year. (Exhibit DC-6, Schapiro letter to Kudner, 11/26/96; exhibit DC-6, commercial development visit report, 1/15/97.)

Schapiro's main contact at Avecia at that time seems to have been Donald Kudner. Until the fall of 1997, Kudner was Avecia's commercial development manager for Reputex. By April 1997, Avecia had registered PHMB with the EPA as Vantocil for the control of microorganisms on textiles and non-wovens. By May 5, 1997, Schapiro knew of this registration. (Exhibit DA-10, Schapiro memo to Kudner, 5/5/97.) Though Schapiro claims not to have known that Vantocil and Reputex were names for the same product, Avecia informed him so on June 9, 1997 (exhibit DA-12, Burt fax to Schapiro, 6/9/97) (enclosing draft labels for Vantocil and explaining that PHMB would "be marketed under the alternate brand name of Reputex").

Avecia told Schapiro that the registration did not permit public health claims. (Exhibit DA-10, Schapiro fax to Kudner, 5/5/97; exhibit DA-12, Burt fax to Schapiro, 6/9/97.) Schapiro understood this, (exhibit DC-5, Schapiro dep., 7/7/00, at 123-24), and he then got a quotation from a laboratory to determine how much it would cost to develop data to support a PHMB public health claim registration. (Exhibit DC-17, Gibraltar Laboratories quotation, 7/15/97.)

At Avecia's recommendation, Schapiro hired Attorney James Wright to assist him in designing EPA-acceptable packaging for PHMB-treated cloths. Schapiro sent sample packaging to Wright. Wright reviewed the packaging and, on July 18, 1997, faxed and mailed Schapiro a legal opinion on the permitted scope of the claims on the Saniclean labels. As Wright was giving his opinion on the Vantocil registration, he referred to PHMB as Vantocil, not Reputex. He also specifically explained that, at that time, public health claims would not be permitted for cloths treated with PHMB. (Exhibit DA-14, Wright memo to Schapiro, 7/18/97.)

A few days later, Schapiro sent a fax to the firm handling the artwork for the Reputex packaging. The fax read, in part:

"Finally got a fax from the attorney concerning what we are now allowed to say until we register products further with the EPA. Until we submit testing and get approval, we cannot say certain things about specific bacteria so need to be more general. Here are the suggested changes . . . ." (Exhibit DA-15, Schapiro fax to Baker, 7/21/97.) The changes were substantively the same as those that Wright suggested.

On June 9, 1997, Zeneca informed Schapiro that PHMB was not registered in Mexico, and that "expert legal counsel should be sought" on using PHMB in Mexico. (Exhibit DA-12, Burt fax to Schapiro, 6/9/97.)

Therefore, as late as July 21, 1997, Schapiro knew that the American registration of PHMB did not permit public health claims, and as late as June 9, 1997, he knew that PHMB was not registered in Mexico. Furthermore, he knew or should have known that Reputex and Vantocil were alternate brand names for PHMB.

In their affidavits, however, Schapiro and Steven Krupnick aver that, during summer 1997, Kudner assured them that Zeneca would expand the PHMB registration to permit public health claims and to permit sale and use of PHMB in Mexico and Canada. (Krupnick aff. ¶¶13, 17; Schapiro aff. ¶¶25, 29.) Anticipating an agreement with Avecia, Schapiro and Krupnick formed Textile Biocides to sell Reputex and formed Saniclean to manufacture and sell Reputex-treated products. (Krupnick aff. ¶14; Schapiro aff. ¶26.) According to the plaintiffs, the expansion of the registrations was the only thing holding up the execution of the agreements. (Exhibit P-6, Krupnick dep., 7/14/00, at 83-87.) In their affidavits, Schapiro and Krupnick aver that "[o]n or around August 20, 1997" Kudner told them that Zeneca had obtained the public health claim registration in the United States and the Mexico and Canada registrations and that the agreements were ready to be signed. (Krupnick aff. ¶¶17, 18; Schapiro aff. ¶¶29, 30.)[3] On

---

3. As the survival of plaintiffs' fraud claims depends almost entirely on these affidavits, the relevant paragraphs of the affidavits are worth reproducing:

August 20, 1997, Avecia signed a sales representative agreement with Textile Biocides and an exclusive supply agreement with Saniclean. (Exhibit DA-1, sales representative agreement; exhibit DA-2, exclusive supply agreement; Krupnick aff. ¶18; Schapiro aff. ¶30.) Though the agreements referred to an attached EPA registration no. 10182-128, the plaintiffs allege that registration was not attached to either agreement. (Krupnick aff. ¶18; Schapiro aff. ¶20.) Krupnick and Schapiro claim never to have seen the registrations.

---

"17. Throughout the remainder of July 1997 and through mid-August 1997, Mr. Schapiro and I continued our negotiations with Zeneca and continued to be assured and promised by Mr. Kudner that Zeneca was obtaining the necessary and proper registration for Reputex 20, including public health claims, in order for Reputex 20 to be promoted and sold for the antimicrobial treatment of textiles, including, among other things, durable and disposable antimicrobial wipes and towels for industrial use in hotels, restaurants, hospitals and other similar commercial establishments within the United States, Canada and Mexico.

"18. On or around August 20, 1997, Mr. Schapiro and I received a sales representative agreement and exclusive supply agreement from Zeneca which finally included an EPA registration number for Reputex 20. Around this same time, Mr. Kudner represented to Mr. Schapiro and me that Zeneca now had the necessary and proper registration and that the agreements were ready to be signed." (Krupnick aff. ¶¶17, 18; Schapiro aff. ¶¶29, 30.)

One could interpret these vague averments as alleging that Kudner made no misrepresentations and/or that he made them after August 20. Krupnick and Schapiro's deposition testimony supports this interpretation. But the court must view the evidence in the light most favorable to the non-moving party. For the sake of Avecia's motion, the court reads the averments as alleging that, before the plaintiffs signed the agreements, Kudner specifically told them that Avecia had registered Reputex in the United States for public health claims and in Mexico and Canada.

Under the sales representative agreement, Avecia appointed Textile Biocides as a non-exclusive sales representative for Reputex in the United States, Canada and Mexico. (Exhibit DA-1, sales representative agreement ¶1.) Textile Biocides would solicit orders for Reputex and forward the orders to Avecia for acceptance. (Exhibit DA-1, sales representative agreement ¶5.) Avecia would accept or reject the order—"generally . . . within 10 days" and pay Textile Biocides a commission of 7 1/2 percent on Textile Biocides' net sales of Reputex. Avecia retained the right to refuse any order "in its sole discretion" and "at any time and for any reason." (Exhibit DA-1, sales representative agreement ¶¶5, 6.) Avecia retained the right to contact any customers in Textile Biocides' territory directly. (Exhibit DA-1, sales representative agreement ¶6.) The initial term of the agreement was three years. (Exhibit DA-1, sales representative agreement ¶13(a).) It was terminable by either party on 30 days written notice and renewable by mutual agreement for one-year periods. (Exhibit DA-1, sales representative agreement ¶13(a) and (b).)

Under the exclusive supply agreement, Saniclean agreed to buy, and Avecia agreed to sell, 100 percent of Saniclean's requirements of Reputex at $10 per pound, in the United States, Mexico and Canada, which the agreement called the marketing area. (Exhibit DA-2, exclusive supply agreement ¶¶1.1, 5.1 and ex. C.) Avecia would sell Reputex to Saniclean on an exclusive basis for "use on durable and disposable antimicrobial wipes and towels (but specifically excluding the use of the products to preserve liquids) for industrial use in hotels, restaurants, hospitals, other similar commercial

establishments and consumer uses . . . ," which the agreement called the field of use. (Exhibit DA-2, exclusive supply agreement ¶1.2.) The exclusivity provision, however, was contingent on Saniclean's purchasing 50,000 pounds of Reputex in the first contract year,[4] 100,000 pounds in the second contract year and 125,000 pounds in the third contract year. (Exhibit DA-2, exclusive supply agreement ¶4.1 and ex. B.) If Saniclean failed to meet a minimum purchase requirement, Avecia had the option, within 30 days of the end of the contract year, to change the exclusive relationship with Saniclean to a non-exclusive relationship. (Exhibit DA-2, exclusive supply agreement ¶4.1.) The initial term of the agreement ended December 31, 2000, and it was renewable for additional periods of one year each by mutual agreement of the parties. (Exhibit DA-2, exclusive supply agreement ¶3.1.)

Both agreements contained integration clauses. (Exhibit DA-1, sales representative agreement ¶16; exhibit DA-2, exclusive supply agreement ¶6.12.)

By August 22, 1997, Textile Biocides had begun contacting potential customers. (Exhibit P-17, Textile Biocides' notices to Avecia of customer contacts.)

In an August 25, 1997 letter, Kudner informed Krupnick that Avecia was "still in the process of adding Reputex to our sales range and sorting out the EPA claims our customers can make." (Exhibit P-14, Kudner letter to Krupnick 8/25/97.) Krupnick and Schapiro claim that this letter alerted them to problems with the

---

4. The first contract year was August 20, 1997 to December 31, 1998. The second and third contract years coincided, respectively, with the 1999 and 2000 calendar years.

Reputex registration. (Krupnick aff. ¶22; Schapiro aff. ¶34.) They called Kudner, who they claim was embarrassed about Avecia's failure to obtain the proper registrations and who assured them that Avecia would obtain the registrations as soon as possible. (Krupnick aff. ¶¶22, 23; Schapiro aff. ¶¶34, 35.) Based on Kudner's assurances, Krupnick and Schapiro agreed to continue their relationship with Avecia, and the plaintiffs continued to contact potential customers. (Exhibit P-17, Textile Biocides' notices to Avecia of customer contacts; Krupnick aff. ¶¶24, 25; Schapiro aff. ¶36, 37; exhibit P-18, Kenline e-mail to Rajan et al. 2/5/98.) Krupnick and Schapiro claim that, until the end of 1999, Kudner continued to assure them that Avecia would obtain the Reputex public health claim registration. (Krupnick aff. ¶27; Schapiro aff. ¶39.)

On August 28, 1997, Avecia applied to the EPA to use Reputex as an alternate brand name for Vantocil under registration no. 10182-128. (Exhibit P-15, Burt letter to EPA, 8/28/97.) On September 24, 1997, the EPA approved this application. (Exhibit P-16, EPA letter to Burt, 9/24/97.)[5]

---

5. The plaintiffs allege that Avecia misrepresented that it had already registered PHMB under the name Reputex when they signed the agreements on August 20, 1997. Any fraud claim based on this alleged misrepresentation must fail, because there is no evidence that Avecia affirmatively misrepresented that it had registered the Reputex name or that it made such a misrepresentation intending to mislead the plaintiffs. *Lord v. Souder,* 748 A.2d 393, 402 (Del. 2000) (stating that the elements of fraud under Delaware law include "a false representation" and "an intent to induce the plaintiff to act or refrain from acting"). Furthermore, Avecia cured the defect by registering the Reputex name, and the plaintiffs have not alleged any harm arising from the one-month delay in obtaining this registration. See Restatement (Second) of Contracts §165 (cure by change of circumstances).

On February 26, 1998, the parties signed a sublicensing agreement. The sublicensing agreement allowed Saniclean to "permit other parties in the marketing area to use [Reputex] within Saniclean's exclusive field of use." (Exhibit DA-23, sublicensing agreement, ¶2.) A sublicensee would "be treated as a customer of Textile Biocides under the sales representative agreement, and all sales of [Reputex would] be governed by the terms of the sales representative agreement." (Exhibit DA-23, sublicensing agreement ¶4.)

Sometime in late 1997 or early 1998, Mark Kenline replaced Kudner as the plaintiffs' contact at Avecia. (Krupnick aff. ¶28; Schapiro aff. ¶40.) The plaintiffs claim that Kenline was hostile to them and unwilling to assist them in their marketing efforts. In the following years, the parties' relationship broke down. The plaintiffs claim that Avecia tried to cut the plaintiffs out of deals by contacting their customers directly.

III. *According to Avecia, the Plaintiffs Simply Failed to Make a Reasonable Effort to Sell and Buy Reputex Under the Agreements*

Avecia denies having promised to obtain public health claim registrations for Reputex or to register Reputex in Mexico and Canada. It denies having said that it had such registrations. According to Avecia, Reputex was marketable in the United States without the public health claim registrations, but the plaintiffs failed to make an effort to market it. To prove this, Avecia points to the evidence of the plaintiffs' marketing activities. Textile Biocides' expenses in 1998, the first year of the sales representative agreement, were only $1,226. (Exhibit

DC-30, Textile Biocides' 1998 federal income tax return.) Saniclean seems to have had no expenses that year. (Exhibit DC-50, Saniclean 1998 federal income tax return.) Saniclean never had a bank account. (Exhibit DC-5, Schapiro dep., 6/8/00, at 285.) Krupnick and Schapiro were the plaintiffs' only employees; and over the parties' three-year relationship, they visited only seven customers, though they seem to have contacted many more by phone. (Exhibit DC-5, Schapiro dep., 6/8/00, at 308, and 8/16/00, at 229; exhibit DC-29, Krupnick dep., 8/18/00, at 28-29.) Textile Biocides' sales of Reputex totaled only $30,000 over the entire term of the sales representative agreement. (Exhibit DC-21, summary of Reputex sales.) Saniclean never met its minimum purchase requirements and never granted a sublicense to a third party. (Exhibit DC-5, Schapiro dep., 6/8/00, at 297-98.)[6] Avecia alleges that the plaintiffs deceived it into entering the agreement by misrepresenting their financial status and their ability to carry out their end of the deal. Avecia also alleges that the plaintiffs made untrue promotional claims about Reputex and the plaintiffs' relationship with Avecia.

## SUMMARY OF THE PARTIES' CLAIMS AND THE COURT'S HOLDINGS

Both plaintiffs claim fraud and negligent misrepresentation based on Avecia's misrepresentation of the status of the Reputex registrations. The court denies Avecia's motion for summary judgment on these claims.

---

6. Avecia alleges in its brief that Saniclean never bought any Reputex, but Avecia does not cite any evidence to support the allegation.

Textile Biocides claims fraud based on Avecia's promise to pay commissions. The court grants Avecia's motion for summary judgment on this claim.

Both plaintiffs claim breach of contract and breach of the implied duty of good faith and fair dealing based on Avecia's failure to obtain the Reputex registrations. The court denies Avecia's motion for summary judgment on this claim.

Both plaintiffs claim tortious interference and breach of the implied duty of good faith and fair dealing based on Avecia's contacting potential Reputex customers. The court grants Avecia's motion for summary judgment on these claims.

Avecia claims breach of contract based on the plaintiffs' promotional activities for Reputex and their failure to buy or sell Reputex. Avecia claims fraud based on the plaintiffs' statements about their requirements for Reputex, their financial status and their marketing abilities. The court grants in part the plaintiffs' motion for summary judgment on these claims.

## DISCUSSION

### I. *Choice of Law*

#### A. Delaware Substantive Law Governs Both Sides' Contract Claims

The sales representative agreement states that Delaware law governs the "validity, interpretation, construction and performance of this agreement." (Exhibit DA-1, sales representative agreement ¶17.) The exclusive supply agreement states that "[t]he agreement and per-

formance hereunder shall be governed and construed and interpreted according to" Delaware law. (Exhibit DA-2, exclusive supply agreement ¶6.11.) A choice-of-law provision in a contract is valid if the transaction bears a reasonable relation to the jurisdiction whose law is chosen. *Churchill Corp. v. Third Century Inc.,* 396 Pa. Super. 314, 324, 578 A.2d 532, 537 (1990); Restatement (Second) of Conflict of Laws §187, cited in *Schifano v. Schifano,* 324 Pa. Super. 281, 289 & n.5, 471 A.2d 839, 843 & n.5 (1984). The transactions at issue in this suit bear a reasonable relation to Delaware. Avecia is a Delaware corporation and its principal place of business is in Delaware. Saniclean is a Delaware corporation. The parties executed the contracts in Delaware and Avecia's performance under the contract took place through its Delaware offices. Therefore, Delaware law applies to the plaintiffs' contract claims and Avecia's contract counterclaims.

### B. The Parties Have Agreed in Their Briefs That Delaware Law Governs the Plaintiffs' Fraud, Negligent Misrepresentation and Tortious Interference Claims

There seems to be no published decision by a Pennsylvania state appellate court addressing whether a contractual choice of law provision extends to misrepresentation and tortious interference claims arising from the contracting parties' relationship. One Pennsylvania federal court applying Pennsylvania choice of law rules has held that a choice of law provision does not govern tort claims "unless the fair import of the provision embraces all aspects of the legal relationship." *Jiffy Lube*

*Int'l Inc. v. Jiffy Lube of Pa. Inc.,* 848 F. Supp. 569, 576 (E.D. Pa. 1994). See also, *Stone Street Services Inc. v. Daniels,* 2000 WL 1909373, at *4 n.7 (E.D. Pa.); *Coram Healthcare Corp. v. Aetna U.S. Healthcare Inc.,* 94 F. Supp.2d 589, 593 (E.D. Pa. 1999).[7] Under the Restatement, however, there seems to be a presumption that a contractual choice of law extends to misrepresentation claims or other claims affecting the validity of the contract. Restatement (Second) of Conflict of Laws §§200, 201. See also, *Mazzioni Farms Inc. v. E.I. Du Pont de Nemours & Co.,* 761 So.2d 306, 307 n.2, 313 (Fla. 2000).[8] The Restatement does not directly

---

7. In *Stone Street Services,* the court concluded that a contractual choice of Pennsylvania law encompassed the plaintiff's consumer fraud claims where the agreement stated that the " 'obligations of the parties . . . shall be governed, interpreted, construed, and enforced' in accordance with Pennsylvania law." *Stone Street Services,* 2000 WL 1909373, at *4 n.7 (refusing however to apply Pennsylvania law because doing so would violate the strong public policy of Kansas). In *Coram Healthcare,* the court concluded that a contractual choice of Delaware law did not encompass the plaintiff's common-law fraud claims where the agreement stated that the " 'agreement shall be governed by the laws of the State of Delaware' " and "did not refer to the matter of contract validity." *Coram Healthcare Corp.,* 94 F. Supp.2d at 593. Under *Stone Street Services* and *Coram Healthcare,* Delaware law would apply to Textile Biocides' fraud claims because the choice of law provision in the sales representative agreement mentions contract validity. Pennsylvania law would apply to Saniclean's fraud claims because the choice of law provision in the exclusive supply agreement does not mention contract validity.

8. In a decision contrary to *Coram Healthcare,* the court in *Mazzioni Farms* applied a contractual choice of law to a fraudulent inducement claim even though the provision, if read strictly, seemed to encompass only contract claims. *Mazzioni Farms,* 761 So.2d at 306 n.2, 313 (applying Delaware law to a fraudulent inducement claim where the contract stated that the contract "shall be governed and construed in accordance with the laws of the State of Delaware"). Under the Restatement

address whether a contractual choice of law applies to a tortious interference claim.

The court need not resolve this issue, however, because the parties already have agreed in their briefs that Delaware law applies to all of the plaintiffs' claims.[9] The court deems this agreement by both sides as a stipulation that Delaware law applies to the plaintiffs' tort claims or an admission that the parties intended that the choice of law provisions extend to tort claims. *Tyler v. King,* 344 Pa. Super. 78, 88, 496 A.2d 16, 21 (1985) ("[P]arties may bind themselves, even by a statement made in court, on matters relating to individual rights and obligations, so long as their stipulations do not affect the court's jurisdiction or due order of business.").[10]

---

and *Mazzioni Farms,* Delaware law would apply to Textile Biocides' and Saniclean's fraud claims.

9. In an apparent attempt to hedge their bets in case they do not like the outcome of this motion under Delaware law, the plaintiffs agreed that Delaware law applies "[f]or purposes of this response to Avecia's motion" only. But the plaintiffs cited no Pennsylvania cases on any issue of substantive law case in their responses to Avecia's motion, and they did not show how the outcome of any issue would differ under Pennsylvania law.

10. There seems to be no published decision by a Pennsylvania state appellate court addressing whether a party may stipulate to choice of law. Courts in other jurisdictions have enforced parties' explicit and implicit choice of law stipulations. See *e.g., Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir. 1989) (applying New York law because parties' briefs relied on New York law and "implied consent to use a forum's law is sufficient to establish choice of law"); *City of Clinton, Ill. v. Moffit,* 812 F.2d 341, 342 (7th Cir. 1987) ("Litigants can, by stipulation, formal or informal, agree on the substantive law to be applied to their case, within broad limits not exceeded here."); *Cates v. Morgan Portable Bldg. Co.,* 780 F.2d 683, 687 (7th Cir. 1985) (holding that parties implicitly stipulated to choice of law); *Mellon Bank v. Aetna Bus. Credit Inc.,* 619 F.2d 1001,

## C. The Court Need Not Decide Which State's Law Applies to Avecia's Fraud Counterclaim Because the Outcome of the Plaintiffs' Motion Is the Same Under Both States' Laws

The parties have not agreed which state's law governs Avecia's fraud counterclaim. Avecia argues that Dela-

1005 (3d Cir. 1980) (holding that party waived an objection to choice of law); *Uniroyal Inc. v. Home Ins. Co.,* 707 F. Supp. 1368, 1372 (E.D. N.Y. 1988) (accepting parties' stipulation that New York law applied to their insurance contracts where there was no strong public policy against applying New York law); *National Can Co. v. Vinylex Corp.,* 687 F. Supp. 375, 376-77 (N.D. Ill. 1988) (deeming parties to have stipulated that Illinois law governed their dispute where both sides maintained in their briefs that Illinois law governed); and *Ackerman v. Foster,* 974 P.2d 1, 9 (Col. App. 1998) (accepting parties' stipulation that California law applied to insurance policy).

Courts in other jurisdictions have enforced choice of law stipulations on issues of tort law. *Twohy v. First Nat'l Bank of Chicago,* 758 F.2d 1185, 1191 (7th Cir. 1985) (holding that parties may stipulate which state's substantive law governs their contract *and tort* claims if the chosen state "bears a reasonable relationship to the alleged transaction and injury in question" and the stipulation "does not violate public policy nor call into question the court's subject matter jurisdiction."); *Von Hundertmark v. Boston Prof'l Hockey Ass'n,* 1996 WL 118538, at *4 (E.D. N.Y. 1996) ("[T]here is no express prohibition against parties stipulating as to choice of law in tort actions."); *Lloyd v. Loeffler,* 694 F.2d 489, 495 (7th Cir. 1982) ("[R]easonable stipulations of choice of law are honored in contract cases, and we do not see any reason why the same principle should not apply in tort cases." (citation omitted)).

These decisions are persuasive. Allowing parties to agree to choice of law after litigation has begun, as long as the state whose law is chosen bears a reasonable relationship to the transaction and the chosen law does not affect the court's subject matter jurisdiction or violate public policy, is the logical rule for several reasons: (1) Pennsylvania allows parties to contractually agree to choice of law, (2) Pennsylvania allows parties to stipulate on matters affecting the parties' rights and obligations after litigation has begun, and (3) stipulations promote

ware law applies to its fraud counterclaim. The plaintiffs argue that Pennsylvania law applies. The court need not resolve this issue because the outcome of the plaintiffs' motion is the same under both states' laws. *Ratti v. Wheeling Pittsburgh Steel Corp.,* 758 A.2d 695, 702 (Pa. Super. 2000) ("In Pennsylvania, choice of law analysis first entails a determination of whether the laws of the competing states actually differ. If not, no further analysis is necessary."), quoted and followed in *Keystone Aerial Surveys Inc. v. Pennsylvania Property & Cas. Ins. Guar. Ass'n,* 2001 WL 460906, at *8-9 (Pa. Super.).

---

judicial economy. See *Conyer v. Borough of Norristown,* 58 Pa. Commw. 629, 632, 428 A.2d 749, 751 (1981) ("[P]arties may stipulate the law of the case and be bound by their act in all matters which affect them so long as the stipulation does not affect the jurisdiction and prerogatives of the court."); *Churchill Corp. v. Third Century Inc.,* 396 Pa. Super. 314, 324, 578 A.2d 532, 537 (1990) (stating that a contractual choice of law is valid if the transaction bears a reasonable relation to the forum whose law is chosen). Though some federal courts have refused to enforce choice of law stipulations, these courts seemed to have accepted a minority view that is inconsistent with Pennsylvania's policy of honoring stipulations. *Consolidated Water Power & Paper Co. v. Spartan Aircraft Co.,* 185 F.2d 947, 949 (3d Cir. 1950) ("While the stipulations of parties in the contract as to choice of law governing a contract are sometimes given effect by courts, no stipulation made after litigation has begun as to the law which is to determine it has ever been upheld so far as we know. Nor do we think it likely to be.") (apparently applying Delaware conflict of law rules), followed in *System Operations Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131, 1137 n.4 (3d Cir. 1977); *Ezell v. Hayes Oilfield Const. Co.,* 693 F.2d 489, 492 n.2 (5th Cir. 1982) (accord). Because Delaware has a reasonable relationship with the transactions, and because applying Delaware law will not violate a public policy of Pennsylvania or affect the court's subject matter jurisdiction, the stipulation is enforceable.

## D. Pennsylvania's Evidentiary Sufficiency Standards Apply to All Claims

Under Pennsylvania conflict of law rules, a Pennsylvania court applies Pennsylvania's evidentiary sufficiency standard to a claim regardless of which state's substantive law applies to the claim. *Foley v. Pittsburgh-Des Moines Co.,* 363 Pa. 1, 10, 68 A.2d 517, 521 (1949) ("The law of the forum also controls all questions as to burden of proof and whether there is sufficient evidence of negligence and proximate causation to entitle the plaintiff to have the case submitted to the jury."); *Sudol v. Gorga,* 346 Pa. 463, 465-66, 31 A.2d 119, 120 (1943) ("The law of the forum determines whether there is sufficient evidence on an issue of fact to warrant its submission to a jury."); *Crawford v. Manhattan Life Ins. Co. of N.Y.,* 208 Pa. Super. 150, 161 n.2, 221 A.2d 877, 884 n.2 (1966) ("The questions of presumption and burden of proof in this regard are, of course, procedural and to be determined by the law of the forum."); Restatement (Second) of Conflict of Laws §135 ("The local law of the forum determines whether a party has introduced sufficient evidence to warrant a finding in his favor on an issue of fact . . . ."). See also, *id.,* cmt. a (listing exceptions not applicable here). Compare with *In re IBP Inc. Shareholders Litig.,* 2001 WL 675330, at *31 (Del. Ch.) (deciding, under Delaware conflict of law rules, that evidentiary sufficiency was an issue of substantive law governed by the law of the state governing the underlying claim). Therefore, both sides must prove their fraud claims by clear and convincing evidence. *Kit v. Mitchell,* 771 A.2d 814, 819 (Pa. Super.

2001) (stating that, in Pennsylvania, a party must prove fraud by clear and convincing evidence). Compare with *In re IBP Inc. Shareholders Litig.*, 2001 WL 675330, at *31 (stating that, in Delaware, a party need only prove fraud by a preponderance of the evidence).

## II. *Standard for Summary Judgment*

Though Delaware substantive law governs some or all of the plaintiffs' claims, the court must apply Pennsylvania procedural rules. *Commonwealth v. Dennis,* 421 Pa. Super. 600, 616, 618 A.2d 972, 980 (1992) ("It is a fundamental [principle] of the conflicts of laws that a court employs its own state's procedural rules."); *Drapeau v. Joy Technologies Inc.,* 447 Pa. Super. 560, 566, 670 A.2d 165, 168 (1996) (Beck, J., concurring) ("This court, as the forum court, applies its own procedural rules even when a contractual choice of law clause provides for the application of another state's substantive laws."). Therefore, the Pennsylvania standard for summary judgment applies to the motion. *Smith v. Commonwealth Nat. Bank,* 384 Pa. Super. 65, 557 A.2d 775 (1989) (applying Pennsylvania standard for summary judgment where New York substantive law governed the plaintiff's claims).

Under the Pennsylvania Rules of Civil Procedure, the court must grant summary judgment if (1) there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery or expert report, or (2) after the completion of discovery, a party bearing

the burden of proof on an issue has failed to produce evidence of facts essential to the cause of action or defense such that a jury could return a verdict in his favor. Pa.R.C.P. 1035.2. The moving party has the burden to prove that there is no genuine issue of material fact. *Hagans v. Constitution State Service Co.*, 455 Pa. Super. 231, 254, 687 A.2d 1145, 1156 (1997). Once the moving party meets this burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* The trial court's function is to determine whether there are controverted issues of fact, not whether there is sufficient evidence to prove the particular facts. *Id.* at 254, 687 A.2d at 1157.

### III. *The Court Grants In Part Avecia's Motion for Summary Judgment on the Plaintiffs' Claims*

### A. The Court Denies Summary Judgment on the Plaintiffs' Fraud Claims Arising From Kudner's Alleged Misrepresentation of the Status of the Reputex Registration (Counts I, II, VII)

The plaintiffs claim that Avecia committed fraud on or about August 20, 1997 when Kudner said that Avecia had registered Reputex in the United States for public health claims and that Avecia had registered Reputex in Mexico and Canada. The plaintiffs have produced sufficient evidence to allow fraud claims based on this statement to go to a jury, and the court denies Avecia's motion for summary judgment on these claims.

Under Delaware law, the elements of fraud are:

"(1) a false representation, usually one of fact, made by the defendant;

"(2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

"(3) an intent to induce the plaintiff to act or to refrain from acting;

"(4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

"(5) damage to the plaintiff as a result of such reliance." *Lord v. Souder,* 748 A.2d 393, 402 (Del. 2000). (quotation omitted) [11]

Krupnick and Schapiro swear in affidavits that Kudner made a representation of fact: that Avecia had these registrations. (Krupnick aff. ¶18; Schapiro aff. ¶30.) There is evidence that the representation was false: Avecia admits that Reputex has never been registered for public health claims in the United States and that Reputex has never been registered in Mexico or Canada. (Exhibit P-39, Kenline dep., 7/25/00, at 443.) A jury could conclude that Kudner—the commercial development manager for Reputex—knew that Avecia did not have these registrations for Reputex or that he was recklessly indifferent to that fact. A jury could infer that Kudner

---

11. The standard for intentional misrepresentation under Pennsylvania law has the same elements:

"(1) A representation;

"(2) which is material to the transaction at hand;

"(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

"(4) with the intent of misleading another into relying on it;

"(5) justifiable reliance on the misrepresentation; and,

"(6) the resulting injury was proximately caused by the reliance." *Bortz v. Noon,* 556 Pa. 489, 499, 729 A.2d 555, 560 (1999). (quotation omitted)

made the statement with the intent to induce the plaintiffs to sign the agreements and that the plaintiffs relied on the statement: Krupnick's and Schapiro's affidavits and testimony indicate that their signing the agreement was contingent on Avecia's obtaining the registrations. (Exhibit P-6, Krupnick dep., 7/14/00, at 87; Krupnick aff. ¶¶17, 18; Schapiro aff. ¶¶29, 30.)[12] There is evidence that the plaintiffs' reliance on Kudner's statements was justified: Kenline testified that it was Avecia's responsibility to obtain the Reputex registrations and that Avecia had more regulatory experience than the plaintiffs. (Exhibit P-53, Kenline dep., 7/26/00, at 696); *Wilmington Trust Co. v. Aetna Cas. & Surety Co.,* 690 A.2d 914, 916-17 (Del. 1996) (holding that whether a plaintiff's reliance on defendant's misrepresentations was justified is a question of fact precluding summary judgment).[13] Finally, there is evidence of damages: the plaintiffs bound themselves to contracts that were arguably less valuable to them than they had bargained for.[14] (Exhibit P-46, expert report on economic damages.)

---

12. On the other hand, correspondence from Schapiro to Kudner indicated that Schapiro was ready to sign an agreement without Avecia's having obtained the public health claim registrations. (Exhibit DB-12, Schapiro fax to Kudner, 5/5/97; exhibit DB-13, Schapiro fax to Kudner, 7/15/97.)

13. In Pennsylvania, too, whether reliance is justified is generally a question of fact precluding summary judgment. *Silverman v. Bell Sav. & Loan Ass'n,* 367 Pa. Super. 464, 533 A.2d 110 (1987); *Rempel v. Nationwide Life Ins. Co.,* 227 Pa. Super. 87, 323 A.2d 193 (1974), *aff'd,* 471 Pa. 404, 370 A.2d 366 (1977).

14. Several days after August 20, 1997, the plaintiffs learned that Avecia did not have the registrations. In spite of their having allegedly learned that Kudner lied to them, the plaintiffs continued to perform for several years. It is questionable whether any reliance on Avecia's mis-

Avecia argues that summary judgment is appropriate because the plaintiffs knew when they signed the agreements that they could not make public health claims for Reputex. Restatement (Second) of Torts §541 ("[T]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or if its falsity is obvious to him."), quoted in *Ward v. Hildebrand,* 1996 WL 422336, at *4 (Del. Ch.).[15] This argument must fail, because there is an issue of fact as to what plaintiffs knew when they signed the agreements. Though Schapiro seems to have known as late as July 21, 1997 that Avecia had no public health claim registration for Reputex, Krupnick and Schapiro aver in their affidavits that Avecia told them it was applying for the public health claim registration, and that, sometime on or about August 20, 1997, Avecia told them it had obtained the registration.[16]

representation after plaintiffs learned of its falsity was justifiable. See W.W. Allen, *Proceeding under executory contract after discovering fraud as waiver of right to recover damages for the fraud,* 13 A.L.R.2d 807, 868 (1950) and Restatement (Second) of Torts §541 ("The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him), quoted in *Ward v. Hildebrand,* 1996 WL 422336, at *4 (Del. Ch.) and *Silverman v. Bell Sav. & Loan Ass'n,* 367 Pa. Super. 464, 473, 533 A.2d 110, 115 (1987). The plaintiffs might argue, however, that Kudner's post-August 20 assurances that Avecia would obtain the registrations tricked them into continuing performance. See *Fox's Foods v. Kmart Corp.,* 870 F. Supp. 599, 609 (M.D. Pa. 1994). Because the parties have not clearly addressed these issues, neither will the court.

15. See also, *Silverman v. Bell Sav. & Loan Ass'n,* 367 Pa. Super. 464, 473, 533 A.2d 110, 115 (1987), quoting Restatement (Second) of Torts §541.

16. The plaintiffs' evidence as to this point is less than compelling. The inconsistent deposition testimony of Krupnick seems to under-

Similarly, Avecia argues that summary judgment is appropriate because the plaintiffs knew before they signed the agreements that Reputex was not registered in Mexico. This argument must also fail. Though Avecia informed Schapiro on June 9, 1999 that Reputex was not registered in Mexico, Krupnick and Schapiro aver in their affidavits that Avecia told them it was applying for the Mexico registration, and that, on or about August 20, 1997, Avecia told them that it had obtained registration.[17]

Avecia argues that the plaintiffs have produced no evidence of fraudulent intent. The court disagrees. Reputex has never been registered in the United States for public health claims and has never been registered in Mexico or Canada. There is evidence, albeit contradictory evidence, that the execution of the agreement was contingent on Avecia's obtaining these registrations. Thus, a reasonable jury could infer that Avecia made the alleged misrepresentations with the intent of inducing the plaintiffs to sign the contracts. *Continental Oil Co. v. Pauley Petroleum Inc.,* 251 A.2d 824, 826 (Del. 1969) ("When an ultimate fact to be determined is one of motive, intention or other subjective matter, summary judgment is ordinarily inappropriate."); *Brandy-*

---

mine their affidavits and indicate that the plaintiffs knew the true status of the Reputex registration when they signed the agreements. (Exhibit DB-1, Krupnick dep., 6/5/00, at 49, 277-79.) But the court cannot resolve this credibility issue on summary judgment.

17. The plaintiffs' evidence on this point is, again, not compelling. In deposition testimony that contradicts his affidavit, Krupnick clearly said that he only assumed from the language of the agreements that Avecia would register Reputex in Mexico and Canada. (Exhibit DB-1, Krupnick dep., 6/5/00, at 95, 277-78.)

*wine Hills Community Ass'n v. T. Bruce Wilmoth Const. Co.,* 1995 WL 767336, at *8 (Del. Ch.) ("Summary judgment is inappropriate where the inference, or ultimate fact to be established, concerns intent or other subjective considerations.").[18]

Avecia argues that the plaintiffs did not rely on Avecia's statements because they relied, instead, on attorney Wright's advice as to the scope of allowable claims under the EPA registration for Reputex. *Lord,* 748 A.2d at 402 (stating that reliance is an element of fraud); *Consolidated Fisheries Co. v. Consolidated Solubles Co.,* 112 A.2d 30, 37 (Del. 1955) ("[E]ven though a representation made be false, that fact is immaterial if the person to whom it is made does not rely upon it but instead acts on his own knowledge."). The evidence clearly shows that Wright advised the plaintiffs about the Reputex registration *before* Kudner allegedly misrepresented that Avecia had obtained the public health claim registration for Avecia. It is not clear that the plaintiffs sought any advice from Wright after Kudner made the alleged misrepresentation. Wright sent a fax to Schapiro on August 20 again discussing the nonavailability of health claims, (exhibit DA-16, Wright letter to Schapiro, 8/20/97), but it is not clear whether Wright knew of Kudner's alleged misrepresentations at that time.

Therefore, the court denies Avecia's motion for summary judgment on Saniclean's fraud claims and the Reputex registration aspect of Textile Biocides' fraud

18. See also, *Rohm and Haas Co. v. Continental Cas. Co.,* 732 A.2d 1236, 1253 (Pa. Super. 1999), *appeal granted,* 562 Pa. 673, 753 A.2d 820 (2000) (recognizing that a jury is permitted to infer an intent to deceive from circumstantial evidence).

claims. In reaching this conclusion, the court realizes that the plaintiffs' evidence might not meet the clear and convincing evidentiary standard that the court will apply at trial. But the "quantum of evidentiary facts which must be adduced to preclude summary judgment is not the same as that required . . . at trial . . . ." *McFadden v. American Oil Co.*, 215 Pa. Super. 44, 55, 257 A.2d 283, 289 (1969) (en banc) (stating that evidence presented by non-moving party need not be clear and convincing to survive motion for summary judgment on fraud claim, although that is the standard to be applied at trial), quoted in *Elder v. Nationwide Ins. Co.*, 410 Pa. Super. 290, 299, 599 A.2d 996, 1000 (1991). See also, *Hagans v. Constitution State Service Co.*, 455 Pa. Super. 231, 254, 687 A.2d 1145, 1157 (1997) ("On a motion for summary judgment it is the function of the trial court to determine whether there are controverted issues of fact, not whether there is sufficient evidence to prove the particular facts."); *Smith v. Commonwealth Nat. Bank,* 384 Pa. Super. 65, 557 A.2d 775 (1989) (applying Pennsylvania summary judgment rules where New York substantive law governed the plaintiff's claims).

## B. The Court Denies Avecia's Motion for Summary Judgment on the Claim of Negligent Misrepresentation (Count VIII)

Alternatively, the plaintiffs allege that Avecia committed negligent misrepresentation on or about August 20, 1997, when Kudner made his alleged statement about the Reputex registrations. There is sufficient evidence of this claim to go to a jury. Under Delaware law, the elements of negligent misrepresentation are:

"(1) a pecuniary duty to provide accurate information, (2) the supplying of false information, (3) failure to exercise reasonable care in obtaining or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon false information." *Darnell v. Myers,* 1998 WL 294012, at \*5 (Del. Ch.), quoted in *Oliver v. Boston Univ.,* 2000 WL 1038197, at \*11 (Del. Ch.).[19]

Delaware courts have held that a pecuniary duty arises from a contract or "when the parties are in the midst of a 'business relationship' from which they expect to derive 'pecuniary' benefits." *Outdoor Techs. Inc. v. Allfirst Fin. Inc.,* 2001 WL 541472, at \*5 (Del. Super. Ct.), citing Restatement (Second) of Torts §552(1); *Darnell v. Myers,* 1998 WL 294012, at \*5 (Del. Ch.) (seller of

---

19. Even were Pennsylvania law to apply to the plaintiffs' negligent misrepresentation claim, that claim would survive summary judgment. The elements of negligent misrepresentation under Pennsylvania law are:

"(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. . . . Moreover, like any action in negligence, there must be an existence of a duty owed by one party to another." *Bortz v. Noon,* 556 Pa. 489, 500, 729 A.2d 555, 561 (1999). (quotation omitted)

This standard is substantially the same as the Delaware standard, though it is not clear whether a plaintiff in Pennsylvania is limited to pecuniary damages. Compare Restatement (Second) of Torts §552 (providing that a plaintiff may recover damages for pecuniary loss on a claim for negligent misrepresentation), cited generally in *Bortz* at 500-501, 729 A.2d at 561, with *Little v. York County Earned Income Tax Bureau,* 333 Pa. Super. 8, 18, 481 A.2d 1194, 1199-1201 (1984) (rejecting Restatement's limitation of damages to pecuniary harm and allowing recovery of emotional damages for negligent misrepresentation).

house assumes pecuniary duty to provide accurate information to buyer about physical condition of house). Because Avecia and the plaintiffs were in the midst of a business relationship from which they expected to derive pecuniary benefits, Avecia had a duty to provide accurate information about the Reputex registrations. *Outdoor Technologies,* 2001 WL 541472, at *5. There is evidence that Avecia supplied false information about the Reputex registration. (Krupnick aff. ¶18; Schapiro aff. ¶30.) A jury could conclude that Avecia—the party in the best position to know the status of the registrations of its own products—failed to exercise reasonable care in obtaining information about the Reputex registration and communicating it to the plaintiffs. And a jury could conclude that the plaintiff suffered pecuniary loss by justifiably relying on Kudner's statements. (Exhibit P-46, expert report on economic damages.)

C. The Court Grants Summary Judgment on Textile Biocides' Claim That Avecia Fraudulently Induced Textile Biocides to Enter the Sales Representative Agreement by Promising to Pay Sales Commissions Under the Agreement (Counts I and VII)

The plaintiffs allege that Avecia committed fraud on August 20, 1997, by promising to pay Textile Biocides sales commissions under the agreement with the intent not to pay those commissions. Avecia argues that summary judgment is appropriate on this claim because the plaintiffs have failed to produce any evidence of damages or intent. The court agrees and grants summary judgment on this aspect of Textile Biocides' fraud claim.

A broken promise to perform a future act, alone, is not the basis for a fraud claim. *Hanna Sys. Inc. v. Capano Group L.P.,* 1985 WL 21119, at \*2 (Del. Ch.); *Murphy v. T.B. O'Toole Inc.,* 87 A.2d 637, 638 (Del. Super. Ct. 1952).[20] But if the promisor, at the time of making the promise, intended not to perform and made the promise only to secure the promisee's performance, the promisee may state a claim for promissory fraud. *Hanna Sys.,* 1985 WL 21119, at \*2; *Murphy v. T.B. O'Toole,* 87 A.2d at 638; John E. Murray Jr., *Contracts* §85(A) n.44 (3d ed. 1990).[21] To succeed on this claim, a plaintiff must produce evidence that, when the defendant made the promise, the defendant intended not to perform it:

"Ordinarily, in the absence of additional circumstances, it will be found that a mere failure to perform is as consistent with an honest intent as with a dishonest one. When that is true, a prima facie case is not made out. Where the circumstances relied upon as indicating fraud are of a doubtful nature, or are susceptible of an innocent interpretation, or are calculated to raise but a bare suspicion of fraud in regard to the person charged therewith, they will not amount to sufficient evidence to establish the fact." *Murphy v. T.B. O'Toole,* 87 A.2d at 638 (footnote and quotation omitted) (granting mo-

---

20. Pennsylvania law is the same on this point. *Nissenbaum v. Farley,* 380 Pa. 257, 264, 110 A.2d 230, 233 (1955).

21. Promissory fraud is actionable under Pennsylvania law. *Brentwater Homes Inc. v. Weibley,* 471 Pa. 17, 23, 369 A.2d 1172, 1175 (1977) ("A statement of present intention which is false when uttered may constitute a fraudulent misrepresentation of a fact."); *Tonkin v. Tonkin,* 172 Pa. Super. 552, 560, 94 A.2d 192, 196 (1953).

tion of summary judgment against plaintiff on promissory fraud claim where plaintiffs had produced no evidence that, when the defendants made the promise, they intended not to perform). See also, *Murphy v. Godwin,* 303 A.2d 668, 672-73 (Del. Super. Ct. 1973) (same). Compare with, *Hanna Sys.,* 1985 WL 21119, at *2 (denying defendant's motion for summary judgment on promissory fraud claim because evidence showing that defendant's conduct was "lacking in candor and fairness" raised issue that defendant intended to deceive).[22]

The plaintiffs have produced no evidence that, on or before August 20, 1997, Avecia intended to deny Textile Biocides' commissions on sales. The plaintiffs have attached numerous pieces of correspondence written after they signed the agreements—the earliest one dated January 28, 1998—in which Avecia personnel questioned whether Textile Biocides would be entitled to commissions on sales to certain customers. Even if this correspondence were to indicate an intent to deny commissions in 1998, it would say nothing about Avecia's intent when it signed the sales representative agreement. *K.E. Property Mgmt. Inc. v. 275 Madison Mgmt. Corp.,*

---

22. Pennsylvania follows the same rule:

"An unperformed promise does not give rise to a presumption that the promisor intended not to perform when the promise was made, and a fraudulent intention will not be inferred merely from its nonperformance. The promisor may have had an honest intention to carry out his promise when he made it. He may have been prevented from carrying it out by unavoidable circumstances, or he may have found, after mature investigation, this his promise was unfortunate. These circumstances would not relate back to the time the promise was made and give rise to an inference of deceit at that time." *Fidurski v. Hammill,* 328 Pa. 1, 2-3, 195 A. 3, 4 (1937) (citations omitted), quoted and followed in *Bash v. Bell Telephone Co.,* 411 Pa. Super. 347, 361, 601 A.2d 825, 832 (1992).

1993 WL 285900, at *7 (Del. Ch.) ("There is a rebuttable presumption that all persons act honestly, properly, in good faith and without fraud."); *Murphy v. T.B. O'Toole,* 87 A.2d at 638 (granting summary judgment on promissory fraud claim where plaintiffs had failed to produce evidence to overcome "the legal presumption of good faith and honesty."). Because the plaintiffs have failed to produce any evidence from which a jury could conclude that Avecia intended on August 20, 1997, not to pay commissions earned under the sales representative agreement, the court grants Avecia's motion for summary judgment on this aspect of Textile Biocides' fraud claim.

## D. The Court Denies Summary Judgment on the Plaintiffs' Contract Claims Based on Avecia's Failure to Obtain the Reputex Registrations (Counts III, IV and VI)

Counts III, IV and VI are contract claims. The plaintiffs allege that Avecia breached contractual duties to obtain the Reputex registrations. The court denies Avecia's motion for summary judgment on these claims.

### 1. *Parol evidence is admissible to show that Avecia had a duty to register Reputex in Mexico and Canada*

The elements of breach of contract are "a contractual obligation, whether express or implied, a breach of that obligation by the defendant and resulting damage to the plaintiff." *Moore Bus. Forms Inc. v. Cordant Holdings Corp.,* 1995 WL 662685, at *7 (Del. Ch.). The plaintiffs argue that Avecia owed them a contractual duty to

register Reputex for public health claims in the United States and to register Reputex for sale, purchase and use in Mexico and Canada for the microbial treatment of textiles.

The express terms of the written agreements themselves imposed no such duty on Avecia. The plaintiffs argue, however, that the court should interpret into the agreements Avecia's alleged pre-agreement promises to obtain the registrations. (Exhibit P-39, Kenline dep., 7/25/00, at 441 ("It would be my understanding and belief that as the [sales agreement] was being put together, the intention was to obtain registrations for Mexico and Canada for [Reputex].") and Krupnick aff. ¶¶17-18 and Schapiro aff. ¶¶25, 30 (averring that Avecia promised to register Reputex in Mexico and Canada).) Avecia argues that the parol evidence rule bars the plaintiffs from introducing evidence of these statements.

Both agreements contain integration clauses. (Exhibit DA-1, sales representative agreement ¶16; exhibit DA-2, exclusive supply agreement ¶6.12.) Where two parties have executed a written contract which they both have agreed is the complete integration of their agreement, Delaware law generally bars the admission of evidence of prior understandings and negotiations to vary or contradict the writing. *Burgess v. Manufactured Housing Concepts LLC,* 1997 WL 364038, at *1 (Del. Super. Ct.). Parol evidence is admissible, however, if the writing is not integrated or is ambiguous as to a disputed term, or if the plaintiff wants to show fraud in support of a claim for reformation of the agreement. *Consolidated Fisheries Co. v. Consolidated Solubles Co.,* 112 A.2d 30, 38 (Del. 1955) (stating that parol evi-

dence is admissible where written agreement does not express the complete understanding of the parties); *James River-Pennington Inc. v. CRSS Capital Inc.,* 1995 WL 106554, at *8 (Del. Ch.) (stating that Delaware law allows a plaintiff to use parol evidence to show fraud in support of a claim for reformation of an integrated agreement).

The court will allow parol evidence of the parties' prior agreements as to the registrations. First, the plaintiffs have alleged fraud. Evidence of Kudner's alleged statements on or about August 20, 1997, about Avecia having registered Reputex for public health claims in the United States and its having registered Reputex in Mexico and Canada is admissible to support reformation of the agreement to impose a duty on Avecia to make reasonable efforts to obtain those registrations. *James River-Pennington Inc. v. CRSS Capital Inc.,* 1995 WL 106554, at *8 (Del. Ch.); Restatement (Second) of Contracts §214(d) and (e).[23]

Second, the agreements are ambiguous as to the duty to register Reputex in Mexico and Canada. In the sales representative agreement, Avecia recited that it manufactured Reputex "for use in the antimicrobial treatment of textiles" and that it "desired [Textile Biocides] to solicit orders for the purchase of [Reputex] by customers or potential customers." (Exhibit DA-1, sales representative agreement, recitals.) Textile Biocides recited that it was "in contact with many customers or potential customers" of Reputex and that it was "desir-

---

23. If the plaintiffs fail to prove fraud, however, this ground for considering the prior assurances will fall away.

ous of serving [Avecia] in the capacity of sales representative for the purpose of soliciting orders for [Reputex] . . . ." (Exhibit DA-1, sales representative agreement, recitals.) Avecia appointed Textile Biocides "as its non-exclusive sales representative within the following geographic area: United States, Canada and Mexico (the Territory)." (Exhibit DA-1, sales representative agreement ¶1.)

In the supply agreement, Avecia recited that it manufactured Reputex for use in the antimicrobial treatment of textiles, and Saniclean recited that it had requirements for Reputex and wished to purchase all of its requirements from Avecia. (Exhibit DA-2, exclusive supply agreement.) Avecia agreed "to sell to [Saniclean] in any contract year . . . 100 percent of [Saniclean's] annual requirements of [Reputex] in the United States, Mexico and Canada (collectively, the marketing area)." (Exhibit DA-2, exclusive supply agreement ¶1.1.)

Both of these agreements are capable of three meanings: (1) the parties agreed to register Reputex in Mexico and Canada, and Avecia had a duty to take reasonable steps to obtain those registrations; (2) the parties agreed to register Reputex in Mexico and Canada, and Textile Biocides and Saniclean had a duty to take reasonable action to obtain those registrations; or (3) the parties did not agree whether to register Reputex in Mexico and Canada, but if Reputex should be registered in Mexico or Canada, they agreed that Textile Biocides would have the right to sell Reputex there and Saniclean would have the right to manufacture and sell Reputex-treated products there. Parol evidence would be admis-

sible to decide which of these meanings the parties intended.[24]

Third, the agreements are not integrated as to the scope of the American registrations for Reputex. The parties' understandings as to the scope of the permissible advertising and labeling claims for Reputex would be set forth in the EPA registrations for Reputex. Both agreements refer to an attached EPA registration no. 10182-128 for Reputex, which would have set forth the scope of those claims. But Krupnick and Schapiro aver in their affidavits that the registration was not attached to either agreement and that they relied on Kudner for their understanding as to the scope of the registration. See Restatement (Second) of Contracts §214 ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . that the writing is or is not an integrated agreement."), cited in *Cochran v. Denton,* 1991 WL 203128, at *3 (Del. Ch.), *aff'd,* 612 A.2d 157 (Del. 1992). The failure to attach the registration, if true, would show that the written agreements are not integrated as to the parties' agreement, if any, on the scope of the American advertising and labeling claims. Therefore, both sides may introduce parol evidence to interpret the agreement as to Avecia's obligations to obtain public health claim registrations.

---

24. A fax from Avecia's employee Dr. Burt to Schapiro—in which Burt advised Schapiro that Reputex was not registered in Mexico for plaintiffs' use and that Schapiro should seek expert legal counsel on this issue—indicates that Avecia left any responsibility for Mexican registration to the plaintiffs. (Exhibit DA-12, Burt fax to Schapiro, 6/9/97.)

Because the parol evidence relevant to the fraud claim and Avecia's duty to obtain registrations is disputed, the court cannot determine the meaning of the contract as to these issues on a motion for summary judgment.

*2. If the plaintiffs succeed in showing that Avecia was required to obtain the Reputex registrations, the implied duty of good faith and fair dealing would have required Avecia to act reasonably to obtain those registrations*

The plaintiffs argue that the duty to obtain the Reputex registrations would arise independently as part of the implied contractual duty of good faith and fair dealing. The court does not completely agree with this argument. But the plaintiffs' contract claims do implicate contractual good faith and the court must deny Avecia's motion for summary judgment on the contractual good faith claim.

Delaware law implies a covenant of good faith and fair dealing in every contract. *Continental Ins. Co. v. Rutledge & Co.,* 750 A.2d 1219, 1234 (Del. Ch. 2000); *Chamison v. Healthtrust Inc.,* 735 A.2d 912, 920-21 (Del. Ch. 1999), *aff'd,* 748 A.2d 407 (Del. 2000). This covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." *Continental Ins. Co.,* 750 A.2d at 1234. (quotation omitted) Contractual good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. The parties' reasonable expectations at the time of contract formation

determine the reasonableness of the challenged conduct." *Id.* (footnotes and quotation omitted) See also, *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del. 1998) (In the "narrow context" of contractual good faith, "this court has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties' reasonable expectations."). Cases invoking contractual good faith "should be rare and fact-intensive, turning on issues of compelling fairness." *Id.* A party may not invoke contractual good faith to imply duties that "contravene the parties' express agreement [or] *to forge a new agreement beyond the scope of the written contract." Chamison,* 735 A.2d at 920-21. (emphasis added)

The express terms of the written agreements do not impose on Avecia any duty to obtain registrations. If parol evidence does not support the plaintiffs' claim that Avecia promised to obtain the registrations, the court will not independently apply contractual good faith to impose this additional substantial obligation on Avecia. *Chamison,* 735 A.2d at 920-21; *Dave Greytak Enters. v. Mazda Motors of Am. Inc.,* 622 A.2d 14, 23 (Del. Ch. 1992) ("[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play."), *aff'd,* 629 A.2d 668 (Del. 1992).[25]

---

25. The plaintiffs might argue that the parties' reasonably expected that Avecia would obtain the registrations, such that Avecia had a contractual good faith duty to obtain the registrations. See *Continental Ins. Co.,* 750 A.2d at 1234. But if the plaintiffs fail to prove by parol

Should the plaintiffs prove by parol evidence, however, that Avecia promised to obtain the Reputex registrations—the implied duty of good faith and fair dealing a duty would have required Avecia to make reasonable efforts to obtain those registrations. *J.A. Jones Constr. Co. v. City of Dover*, 372 A.2d 540, 551-52 (Del. Super. Ct. 1977) (stating that the terms of a contract will ordinarily be read to incorporate "the premise that each party will in good faith make reasonable effort to meet its obligations under the contract."). The typical application of contractual good faith is where the contract gives one party discretion to carry out a condition or duty within that party's control. *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990) ("[I]f one party is given discretion in determining whether [a] condition in fact has occurred[,] that party must use good faith in making that determination."); Steven J. Burton & Eric G. Andersen, *Contractual Good Faith: Formation, Performance, Breach, Enforcement* §3.4.2.5, at 104-106 (1995). For example, the plaintiffs could succeed in proving by parol evidence that Avecia promised to register public health claims for Reputex. The plaintiffs' right to make public health claims would then be conditioned on Avecia's obtaining

evidence that Avecia orally promised to obtain the registrations, the plaintiffs' alleged expectations were not justified. If the plaintiffs can show by parol evidence that Avecia undertook a duty to apply for the registrations, only then will contractual good faith impose on Avecia a duty to make a reasonable effort to obtain the registrations. See Steven J. Burton & Eric G. Andersen, *Contractual Good Faith: Formation, Performance, Breach, Enforcement* §3.4.2.5, at 104-106 (1995) (discussing view that contractual good faith does not ground an action that is independent of the parties' agreement).

EPA approval of those claims. Contractual good faith would require Avecia to make reasonable efforts to obtain the approval. See Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv. L. Rev. 369, 383 (1980) ("[A] party whose performance is conditioned on governmental approval of its plans . . . may be required to act in good faith to secure the fulfillment of the condition." (footnotes omitted)).

### 3. *Doubt as to whether Avecia breached these duties precludes summary judgment*

Proof that Avecia breached any duty to take reasonable efforts to obtain the registrations must be both objective and subjective. The plaintiffs must show that Avecia failed to take reasonable steps to obtain the registrations and that its failure to do so "involved fraud, deceit, or misrepresentation." *Continental Ins. Co.,* 750 A.2d at 1234. Avecia admits that Reputex is not and never was registered in Mexico or Canada, and that it has never been registered for public health claims in the United States. (Exhibit P-8, Burt dep., 6/19/00, at 199-200; exhibit P-39, Kenline dep., 7/25/00, at 443; exhibit P-49, Kenline dep., 5/17/00, at 90-91; exhibit P-52, Kenline dep., 5/18/00, at 233.) Since neither side has addressed in its papers exactly what steps Avecia should have taken and what steps Avecia actually took to obtain these registrations, Avecia's breach is a fact issue on which the court cannot grant summary judgment.[26] *Merriweather v. Philadelphia Newspapers*

---

26. At his deposition, Kenline affirmed that Avecia has prepared a protocol for submission to the EPA to support an expansion of the

*Inc.,* 453 Pa. Super. 464, 471, 684 A.2d 137, 140 (1996) ("Summary judgment may only be granted in cases where it is clear and free from doubt that the moving party is entitled to judgment as a matter of law.").

### 4. *There is evidence that the alleged breach damaged the plaintiffs*

The plaintiffs have produced evidence of damages in the form of income they would have earned had Avecia obtained the registrations. (Exhibit P-46, expert report on economic damages.) This evidence creates an issue of fact precluding summary judgment. See *Liborio II L.P. v. Artesian Water Co.,* 593 A.2d 571, 575 (Del. Super. Ct. 1990) ("Where there is a need to more fully develop the facts [related to damages] and the law applicable to those facts, summary judgment is inappropriate.").[27]

### C. The Court Grants Avecia's Motion for Summary Judgment on the Plaintiffs' Implied Duty of Good Faith and Tortious Interference Claims Based on Avecia's Directly Contacting Potential Reputex Customers (Counts V and VI)

The plaintiffs allege that Avecia frequently contacted the plaintiffs' customers and potential customers after the plaintiffs had spent time and effort marketing

---

Reputex registration to include public health claims. (Exhibit P-51, Kenline dep., 8/25/00, at 870.) It is not clear when Avecia prepared the protocol.

27. *Thorsen v. Iron and Glass Bank,* 328 Pa. Super. 135, 141, 476 A.2d 928, 931 (1984) (stating that summary judgment on the basis of absence of damages is generally improper in a contract case).

Reputex to those customers, that Avecia encouraged these customers to deal directly with Avecia, and that Avecia attempted to deny Textile Biocides' commissions on sales to the customers. Based on these allegations, the plaintiffs claim tortious interference with prospective contractual relations and breach of the implied duty of good faith and fair dealing. The court grants summary judgment against the plaintiffs on these claims.

### 1. *The court grants summary judgment on the tortious interference claim*

Under Delaware law, the elements of tortious interference with prospective contractual relations are (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional action by the interferer, (4) that causes a breach or termination of the relationship or expectancy, and (5) resulting damages to the party whose relationship or expectancy has been disrupted. *Rypac Packaging Mach. Inc. v. Poges,* 2000 WL 567895, at *10 (Del. Ch.); *Merck & Co. v. Smithkline Beecham Pharm. Co.,* 1999 WL 669354, at *45 (Del. Ch.), *aff'd,* 746 A.2d 277 (Del. 2000). The interference must be "improper" or unprivileged. *DeBonaventura v. Nationwide Mut. Ins. Co.,* 428 A.2d 1151, 1153-54 (Del. 1981); *CPM Indus. Inc. v. ICI Americas Inc.,* 1990 WL 28574, at *2 (Del. Super. Ct.); Restatement (Second) of Torts §767.[28]

---

28. The elements of tortious interference under Pennsylvania law are substantially the same:

"(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

The court grants Avecia's motion for summary judgment on Saniclean's tortious interference claim because Saniclean has not identified a single customer or potential customer that Avecia contacted.

There is evidence that Avecia contacted three Textile Biocides' customers: Kendall, Milliken and Courtalds. (Exhibit P-54, Krupnick dep., 6/5/00, at 135; exhibit P-64, Burt fax to Kenline, 5/14/98; exhibit P-68, Krupnick e-mail to Loricchio, 3/24/99; exhibit P-69, Krupnick e-mail to Loricchio, 1/13/99; Krupnick aff. ¶39.) That Avecia contacted them was not in itself improper, for Textile Biocides expressly agreed in the sales representative agreement that Avecia could do so. (Exhibit DA-1, sales representative agreement ¶6.) Furthermore, there is no evidence that any business relationship was disrupted or that Textile Biocides lost any commissions because Avecia contacted those customers.

Therefore, the court grants Avecia's motion for summary judgment on Textile Biocides' tortious interference claim.

---

"(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

"(3) the absence of privilege or justification on the part of the defendant; and

"(4) the occasioning of actual legal damage as a result of the defendant's conduct." *Strickland v. University of Scranton,* 700 A.2d 979, 985 (Pa. Super. 1997). (citations omitted)

### 2. *The court grants summary judgment on the contractual good faith claim to the extent that the claim is based on Avecia's contacts with the plaintiffs' customers*

The court grants summary judgment against Saniclean on this aspect of its contractual good faith claim because Saniclean has not identified a single customer that Avecia contacted. The court grants summary judgment against Textile Biocides because Textile Biocides expressly agreed in the sales representative agreement that Avecia could contact customers within Textile Biocides' territory. (Exhibit D-1, sales representative agreement ¶6); *Chamison v. Healthtrust Inc.,* 735 A.2d 912, 921 (Del. Ch. 1999) ("The implied covenant cannot contravene the parties' express agreement . . . .").

## IV. *The Court Grants In Part the Plaintiffs' Motion for Summary Judgment on Avecia's Counterclaims*

### A. The Court Grants the Plaintiffs' Motion for Summary Judgment on Avecia's Contract Counterclaims Only to the Extent That Avecia Bases Those Claims on the Plaintiffs Creating Obligations on Avecia's Behalf (Counts I and II)

Avecia alleges two types of contract breaches: (1) the plaintiffs' promotional activities violated the agreements, and (2) the plaintiffs did not use their best efforts to sell and buy Reputex. The plaintiffs argue that the court should grant summary judgment on Avecia's contract counterclaims because (1) Avecia has not produced evidence that the plaintiffs breached the agree-

ments, (2) any breach is excusable because of Avecia's failure to obtain the public health claim registrations, and (3) Avecia has not produced evidence of damages resulting from any breach. The court denies summary judgment on the counterclaim except for one aspect of the promotional activities claim.

### 1. *The court denies summary judgment on Avecia's counterclaim that Textile Biocides breached the sales representative agreement by making unapproved statements in its promotional materials*

Textile Biocides agreed not to use any advertising or promotional materials for Reputex except those supplied by Avecia and not to make any representations or warranties about Reputex, except those contained in Avecia's advertising promotional materials, without Avecia's written approval. (Exhibit DA-1, sales representative agreement ¶8.) There is evidence that, in violation of EPA regulations, Textile Biocides repeatedly promoted Reputex as effective against specific pathogens and as safe for food service. (Exhibit DC-24, Textile Biocides promotional materials.) There is evidence that Textile Biocides falsely told potential customers that Reputex is used in contact lens cleaning solution and that efficacy tests existed concerning the effectiveness of Reputex against specific bacteria. (Exhibit DC-24, Textile Biocides promotional materials.) There is evidence that Textile Biocides misrepresented the scope of its relationship with Avecia. (Exhibit DC-24, Textile Biocides promotional materials; exhibit P-MM, Kenline letter to Schapiro, 8/12/98.) There is no evidence that Avecia approved these promotions. Therefore, the court

denies summary judgment on this aspect of the contract claim.

### 2. *The court grants summary judgment on Avecia's counterclaim that both plaintiffs breached their agreements by incurring unauthorized obligations on Avecia's behalf*

Textile Biocides agreed not "to assume or create any obligation or responsibility, express or implied, on behalf or in the name of Avecia or bind [Avecia] in any manner or thing whatsoever." (Exhibit DA-1, sales representative agreement ¶6.) Saniclean agreed to a similar provision. (Exhibit DA-1, exclusive supply agreement ¶6.6.) Though Avecia has produced evidence that the plaintiffs made misleading statements to potential customers about the relationship between Avecia and the plaintiffs, there is no evidence that these statements caused Avecia to be bound in any way. (Exhibit P-MM, Kenline letter to Schapiro, 8/12/98.) The court grants summary judgment against Avecia on this aspect of the contract claim.

### 3. *The court denies judgment on Avecia's counterclaim that both plaintiffs breached their agreements by failing to use their best efforts to buy and sell Reputex*

Avecia alleges that Textile Biocides breached paragraph 9 of the sales representative agreement, in which it agreed to use its best efforts to sell Reputex. See *Corwin v. DeTrey,* 1989 WL 146231, at *2 (Del. Ch.) (rejecting argument that best efforts clause was unenforceable and stating that "the failure of a party to exer-

cise best efforts can form the basis for liability in a breach of contract action."). Though Schapiro predicted that he would sell 39,000 or even 118,000 pounds of Reputex in the first year, there is evidence that Textile Biocides merely sold about 3,000 pounds in three years, that it visited only seven potential customers in those three years, that it did not maintain records of costs incurred, and that its expenses in 1998 were only $1,226. (Exhibit DC-6, Schapiro letter to Kudner, 11/26/96; exhibit DC-7, commercial development visit report, 1/15/97; exhibit DC-21, summary of Reputex sales; exhibit DC-30, Textile Biocides' 1998 federal tax return; exhibit DC-5, Schapiro dep., 6/8/00, at 287, and 8/16/00, at 229; exhibit DC-29, Krupnick dep., 8/18/00, at 28-29.) This evidence is sufficient for a jury to find that Textile Biocides did not use its best efforts to market Reputex. Therefore, summary judgment is not appropriate on the best efforts aspect of Avecia's contract counterclaim against Textile Biocides.

Avecia alleges that Saniclean breached the exclusive supply agreement by not buying any Reputex. (Exhibit DC-3, answer, counterclaims ¶25a.) "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." 6 Del. Code §2-306(2).[29]

29. In support of its argument that it was not required to buy any Reputex, Saniclean cites to inapposite cases involving *non-exclusive* outputs and requirements contracts. See *e.g., Dorn v. Stanhope Steel Inc.,* 369 Pa. Super. 557, 570, 534 A.2d 798, 805 (1987); *HML Corp. v. General Foods Corp.,* 365 F.2d 77, 81 (3d Cir. 1966); *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.,* 130 F.2d 471, 473 (3d Cir. 1942). See also, 6 Del. Code §2-306(1).

See also, *Wood v. Lucy, Lady Duff-Gordon,* 118 N.E. 214 (N.Y. 1917) (Cardozo, J.) (holding that a contract for an exclusive agency to market a product contains an implied promise to use all reasonable efforts to market the product). This obligation protects the seller who, in an exclusive arrangement depends solely upon the buyer to resell the goods. See *Tigg Corp. v. Dow Corning Corp.,* 962 F.2d 1119, 1125 (3d Cir. 1992) (applying Michigan's version of UCC §2-306(2) to exclusive requirements contract). Neither side has presented a standard by which this court should measure best efforts, and there appears to be no published case addressing UCC §2-306(2) under Delaware law. See John E. Murray, Jr., *Contracts* §58.1, at 221-22 (3d ed. 1990) (stating that best efforts under UCC §2-306(2) is undefined, but that it seems to require "a level of industry and even creativity" that goes beyond simple good faith). The court need not now determine a precise standard for best efforts, for Avecia has produced evidence that Saniclean made little or no effort to create a market for its Reputex-treated wipes. Even without public health claims, Reputex-treated products seem to be marketable. (Exhibit DC-5, Schapiro dep., 6/7/00, at 254.) Nonetheless, Saniclean never met its minimum purchase requirements, visited only seven customers, maintained no records of costs incurred, showed no expenses on its 1998 federal income tax form, and did not even set up a bank account. (Exhibit DC-5, Schapiro dep., 6/8/00, at 285, 287, 297-98, and 8/16/00, at 229; exhibit DC-29, Krupnick dep., 8/18/00, at 28-29; exhibit DC-50, Saniclean 1998 federal income tax return.) This evidence is sufficient for a jury to find that Saniclean

did not use its best efforts to market Reputex-treated products. Therefore, summary judgment is not appropriate on the best efforts aspect of Avecia's contract counterclaim against Saniclean.

Saniclean argues that, if it did not meet the minimum purchase requirements, Avecia's sole remedy was to revoke Saniclean's exclusivity. (Exhibit DA-2, exclusive supply agreement ¶4.1.) The court disagrees. The exclusive supply agreement does not expressly limit Avecia's remedies on breach to revocation of the exclusivity. Unless parties expressly agree that a contractually provided remedy is exclusive, resort to that remedy is optional. 6 Del. Code §2-719(1)(b).

Both plaintiffs argue that the court must grant summary judgment on Avecia's contract counterclaims because Avecia breached the agreements first by not getting the Reputex registrations. The court disagrees. Though one party's material breach of a contract might excuse the other party's failure to perform, *Eastern Elec. & Heating Inc. v. Pike Creek Prof'l Ctr.,* 1987 WL 9610, at *3 (Del. Super. Ct.), there is a genuine issue of material fact as to whether Avecia breached the agreements. To succeed in their defense of prior material breach, the plaintiffs must show that Avecia had a duty to register public health claims. The evidence that would support the existence of that duty is the deposition testimony and testimonial affidavits of Krupnick and Schapiro. Deposition testimony and testimonial affidavits of the moving party, even if uncontradicted, are not a sufficient basis for summary judgment. *Penn Center House Inc. v. Hoffman,* 520 Pa. 171, 176, 553 A.2d 900, 903 (1989); *Borough of Nanty-Glo v. American*

*Surety Co.,* 309 Pa. 236, 163 A. 523 (1932); *Smith v. Commonwealth Nat'l Bank,* 384 Pa. Super. 65, 557 A.2d 775 (1989) (applying Pennsylvania summary judgment rules where another state's substantive law governed the claims).

The plaintiffs argue that the court must grant summary judgment because Avecia has offered no evidence of damages. The court disagrees. Avecia has produced evidence of damages: it spent more than $185,000 helping the plaintiffs market Reputex, while Textile Biocides sold only $30,000 worth of Reputex, and Saniclean never met its minimum purchase requirements. (Exhibit DC-5, Schapiro dep., 6/8/00, at 297-98; exhibit DC-21, summary of Reputex sales; exhibit DC-46, Scott letter to Schapiro, 8/12/99; exhibit DC-47, Pierce e-mail to Kenline, 8/10/99.) Therefore, the court cannot grant summary judgment based on absence of damages. See *Liborio II L.P. v. Artesian Water Co.,* 593 A.2d 571, 575 (Del. Super. Ct. 1990) ("Where there is a need to more fully develop the facts [related to damages], summary judgment is inappropriate.").[30]

### B. The Court Grants the Plaintiffs' Motion for Summary Judgment on Avecia's Fraud Counterclaim Only to the Extent That Avecia Bases That Claim on Saniclean's Statement That It Had Requirements for Reputex

Avecia alleges fraud based on four representations by the plaintiffs. The elements of fraud are substantially

---

30. *Thorsen v. Iron and Glass Bank,* 328 Pa. Super. 135, 141, 476 A.2d 928, 931 (1984) (stating that summary judgment on the basis of absence of damages is generally improper in a contract case).

the same under Pennsylvania and Delaware law: (1) A false representation, (2) which is material to the transaction at hand, (3) the defendant's knowledge of its falsity or recklessness as to whether it is true or false, (4) made with the intent of misleading another into relying on it, (5) plaintiff's action taken in justifiable reliance on the misrepresentation, and (6) damage proximately caused by the reliance. *Bortz v. Noon,* 556 Pa. 489, 499, 729 A.2d 555, 560 (1999); *Lord v. Souder,* 748 A.2d 393, 402 (Del. 2000). The parties disagreement over which state's law applies to Avecia's fraud counterclaim is immaterial to this motion.[31]

---

31. Pennsylvania and Delaware have different parol evidence rules. In Pennsylvania, the parol evidence rule bars a party from relying on prior fraudulent oral representations to prove fraudulent inducement where the representations relate to a subject that was specifically dealt with in an integrated written contract. *HCB Contractors v. Liberty Place Hotel Assocs.,* 539 Pa. 395, 398, 652 A.2d 1278, 1279-80 (1995); *1726 Cherry Street Part. v. Bell Atlantic,* 439 Pa. Super. 141, 155, 653 A.2d 663, 670 (1995). In Delaware, parol evidence is admissible to prove fraudulent inducement. *Anglin v. Bergold,* 1989 WL 88625, at *2 (Del. June 20, 1989) (unpublished); *James River-Pennington Inc. v. CRSS Capital Inc.,* 1995 WL 106554, at *6 (Del. Ch.). The plaintiffs argue that, if Pennsylvania law applies to Avecia's fraudulent inducement claim, Pennsylvania's parol evidence rule bars those claims. See *Coram Healthcare Corp. v. Aetna U.S. Healthcare Inc.,* 94 F. Supp.2d 589, 593 (E.D. Pa. 1999) (applying Pennsylvania parol evidence rule to bar a Pennsylvania-law fraudulent inducement claim, even though Delaware law governed the contract). The court disagrees with the plaintiffs and rejects that aspect of *Coram Healthcare.* The parol evidence rule—the purpose of which is to promote certainty in contractual relations by preserving the integrity of written agreements, *Kehr Packages Inc. v. Fidelity Bank,* 710 A.2d 1169, 1173 (Pa. Super. 1998)—is a rule of contract law. The parties have chosen Delaware law to govern construction and interpretation of their contracts. Therefore, Delaware's parol evidence rule applies to Avecia's fraudulent inducement claim even if

The first representation was Saniclean's statement in the exclusive supply agreement that it had requirements for Reputex. The plaintiffs are entitled to summary judgment on the fraud claim arising from this statement because Avecia has produced no evidence that Saniclean knew the statement to be false when made.

The second, third and fourth representations were Schapiro's statements that (1) "financing is in place as are manufacturing and contract distribution facilities in various parts of the US, Canada and Mexico" (exhibit DC-6, Schapiro letter to Kudner, 11/26/96); (2) that his company, Daniel Schapiro & Co., had "already established our marketing operatives in [the food service and consumer] industries" (exhibit DC-6, Schapiro letter to Kudner, 11/26/96); and (3) that his company, Global Nonwoven Technologies, had "the resources and relationships to provide master distribution of Reputex throughout the textile industry" (exhibit DC-7, Saniclean proposal Zeneca Biocides).

There is evidence that the plaintiffs had no financing at all: Saniclean never had a bank account, and on July 20, 1997, the plaintiffs were so strapped for cash that payment of a bill for $147 seemed to be a problem. (Exhibit DC-5, Schapiro dep., 6/8/00, at 285; exhibit DC-22, Schapiro e-mail to Krupnick, 7/20/97.)

---

Pennsylvania law governs that claim. See *Hutchison ex rel. Hutchison v. Luddy,* 763 A.2d 826, 837 n.8 (Pa. Super. 2000) (stating that, although decisions of federal courts construing Pennsylvania law have persuasive authority, Pennsylvania state courts are not bound by those decisions); *In re Insurance Stacking Litig.,* 754 A.2d 702, 705 (Pa. Super. 2000) (same); *Moore v. Sims,* 442 U.S. 415, 429 (1979) ("State courts are the principal expositors of state law.").

There is evidence that the plaintiffs and Schapiro's other companies had no marketing operatives and that they had few or no resources or relationships in the textile industry. Schapiro and Krupnick are the plaintiffs' only employees. (Exhibit DC-5, Schapiro dep., 6/8/00, at 308.) Rather than having had a marketing network in place when they signed the agreements, the plaintiffs were merely "in discussions with" marketing associates. (Exhibit DC-5, Schapiro dep., 6/8/00, at 308.) It is unclear whether Daniel Schapiro & Co. ever marketed anything in the food industry. (Exhibit DC-5, Schapiro dep., 6/7/00, at 32.) Global Nonwoven Technologies never had any sales. (Exhibit DC-5, Schapiro dep., 6/7/00, at 30.)

From this evidence, a reasonable jury could find that these three statements were false when Schapiro made them and that Schapiro knew they were false. A reasonable jury could also conclude that Schapiro made these three statements with the intent to induce Avecia to enter into agreements with his companies and that Avecia relied on the statements: Schapiro made the statements in proposals to enter into agreements to market Reputex and Avecia entered into those agreements. Whether any reliance on these statements was justified may be questionable,[32] but that issue is for the jury. *Rempel v. Na-*

---

32. In determining whether reliance is justified, the jury must consider the relationship of the parties involved, their expertise and experience and the nature of the transaction. *Rempel v. Nationwide Life Ins. Co.,* 227 Pa. Super. 87, 95, 323 A.2d 193, 197 (1974). The plaintiffs may only have been puffing or expressing opinions about their financial status and marketing abilities. Moreover, the plaintiffs made the statements many months before Avecia signed the agreements. A reasonable jury might find that Avecia—a sophisticated corporation able to

*tionwide Life Ins. Co.,* 227 Pa. Super. 87, 95, 323 A.2d 193, 197 (1974), *aff'd,* 471 Pa. 404, 370 A.2d 366 (1977) (stating that whether reliance is justified is generally an issue of fact for the jury); *Wilmington Trust Co. v. Aetna Cas. & Surety Co.,* 690 A.2d 914, 916-17 (Del. 1996) (same). Finally, there is evidence of damages: Avecia bound themselves to agreements with companies that, from the start, may have been unable to fulfill their obligations under the agreements.

The court denies the plaintiffs' motion for summary judgment on the fraud counterclaim to the extent that Avecia bases the claim on the three statements about the plaintiffs' financial status and marketing abilities.

## CONCLUSION

The court will enter contemporaneous orders granting in part both sides' motions for summary judgment in accordance with this opinion.

---

know whether the plaintiffs were financially capable of living up to the terms of the agreement—did not rely on these statements or that any reliance was not justified. *Rempel* at 95, 323 A.2d at 197; Restatement (Second) of Torts §541, cmt. a ("Although the recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity if he had shown his distrust of the maker's honesty by investigating its truth, he is nonetheless required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation,"), quoted in *Silverman v. Bell Sav. & Loan Ass'n,* 367 Pa. Super. 464, 473-74, 533 A.2d 110, 115 (1987) and cited in *Ward v. Hildebrand,* 1996 WL 422336, at *4 (Del. Ch.). See also, *Consolidated Fisheries Co. v. Consolidated Solubles Co.,* 112 A.2d 30, 37 (Del. 1955) ("It is the general rule that mere expressions of opinion as to probable future events, when clearly made as such, cannot be deemed fraud or misrepresentations.").

ORDER

And now, July 26, 2001, upon consideration of defendant Avecia's motion for summary judgment on the plaintiffs' claims, and the plaintiffs' response, and in accordance with the court's contemporaneously-filed opinion, it is hereby ordered that the motion is granted in part as follows:

(1) Summary judgment on plaintiff Textile Biocides' fraud claims (complaint, Counts I and VII) is denied to the extent that those claims are based on Avecia's alleged misrepresentation of the status of the Reputex registrations.

(2) Summary judgment on plaintiff Textile Biocides' fraud claims (complaint, Counts I and VII) is granted to the extent that those claims are based on Avecia's promise to pay commissions, and that aspect of the claim is dismissed.

(3) Summary judgment on plaintiff Saniclean's fraud claims (complaint, Counts II and VII) is denied.

(4) Summary judgment on the plaintiffs' breach of contract claims (complaint, Counts III and IV) is denied.

(5) Summary judgment on the plaintiffs' tortious interference claim (complaint, Count V) is granted, and that claim is dismissed.

(6) Summary judgment on the plaintiffs' contractual good faith claim (complaint, Count VI) is denied to the extent that the claim is based on Avecia's failure to obtain Reputex registrations.

(7) Summary judgment on the plaintiffs' contractual good faith claim (complaint, Count VI) is granted to the

extent that the claim is based on Avecia's contacting the plaintiffs' customers, and that aspect of the contractual good faith claim is dismissed.

(8) Summary judgment on the plaintiffs' negligent misrepresentation claim (complaint, Count VIII) is denied.

## ORDER

And now, July 26, 2001, upon consideration of the plaintiffs' motion for summary judgment on the defendant's counterclaims, and the defendant's response, and in accordance with the court's contemporaneously-filed opinion, it is hereby ordered that the motion is granted in part as follows:

(1) Summary judgment on the defendant's contract counterclaims (counterclaims, Counts I and II) is granted to the extent that those counterclaims are based on the plaintiffs' promises not to create obligations on Avecia's behalf or bind Avecia, and that aspect of the contract counterclaims is dismissed.

(2) Summary judgment on all other aspects of the defendant's contract counterclaims (counterclaims, Counts I and II) is denied.

(3) Summary judgment on the defendant's fraud claim (counterclaims, Count III) is granted to the extent that that counterclaim is based on Saniclean's statement in the exclusive supply agreement that it had requirements for Reputex, and that aspect of the fraud counterclaim is dismissed.

(4) Summary judgment on all other aspects of the defendant's fraud counterclaim is denied.